UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

DIANE JONES,

            Plaintiff,

        v.                            Case No.  09-C-0868

MICHAEL J. ASTRUE,

            Defendant.

ORDER AFFIRMING COMMISSIONER'S DECISION AND
DISMISSING THE CASE

Diane Jones seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying her application for Supplemental Security Income benefits.  In her application, Jones claimed that a combination of seizure disorders, pain, and mental limitations have limited her ability to work since February 1, 2001.  After the Commissioner denied her application initially and on reconsideration, Jones requested a hearing.  Administrative Law Judge Karen Sayon conducted the hearing on January 15, 2009, and issued a February 20, 2009, decision finding Jones not disabled.  The Appeals Council denied Jones's request for a rehearing, causing the decision to become the final decision of the Commissioner.

Jones requests a Sentence Four remand, alleging that the ALJ: (1) failed to assess or properly assess her physical and mental residual functional capacity in violation of SSR 96-8p and 96-2p; and (2) failed to consider the reasons why she had never worked prior to her injury in violation of SSR 9-7p.  For the reasons set forth below, the Commissioner's decision finding Jones not disabled will be affirmed.

STATEMENT OF FACTS

Jones, who has no past relevant work, has not engaged in substantial gainful activity since her date of application. (Tr. 12, 21.) She graduated the tenth grade having attended special education classes. (Tr. 31.) Jones has difficulty reading, lives with her boyfriend and daughter, and has applied for social security benefits several times. (Tr. 14, 21, 49.)

Jones claims limitations including: (1) seizures and headaches; (2) pain not including headaches; (3) depression; and (4) borderline intellectual functioning. It is unclear when her symptoms started. Given the extensive medical record in this case, the court has organized the statement of facts by physical impairments, mental impairments, and testimony from the hearing.

The record indicates that Jones presented with seizures and headaches to Dr. Mohammad E. Rassouli, and Dr. Rassouli reported in October 2005 that both problems were controlled with medication. (Tr. 15.) In April 2006, Dr. Rassouli stated that Jones was totally disabled, but the electroencephalogram was normal. (Tr. 15, 242.) In July 2006, he noted that Jones had only one seizure in the preceding three months, and that Jones's headaches were under good control. (*Id.*)

In April 2007, Dr. Rassouli noted that Jones had severe daily headaches and one mild seizure. (Tr. 276.) He opined that Jones was unable to work due to epilepsy and headaches. (Tr. 283.) However, later notes indicate that the seizures were under control with medication. (Tr. 275.) Jones had also complained to Dr. Rassouli of worsening headaches. (Tr. 273.) By 2008, however, Jones indicated to Dr. Rassouli that the headaches had improved with medication. (Tr. 269.)

2

Next, Jones experienced pain symptoms not including headaches from a variety of causes. Drs. Pedro O. Ranola, Srinivas Bramhadevi, Paul B. Halverson, and Pamela Thomas-King treated Jones for pain symptoms. Generally, Jones complained of back pain and arthritis pain in her legs, big toe, and hands. (Tr. 14.) Pain was a level nine on a scale of one to ten. (Tr. 388.) Allegedly pain limited Jones's ability to sit to 30 minutes and to stand to 15 minutes, and her ability to walk was limited to 1-2 blocks with breaks. (Tr. 36, 37.) To treat her pain, Jones used wrist braces, medication, and a heating pad. (*Id.*) She also laid down daily, and attended physical therapy. (Tr. 36.)

Meanwhile, Dr. Ranola began treating Jones for rheumatoid arthritis in March 2005. (Tr. 172.) X-rays revealed mild degenerative changes, but medication treated the condition. (Tr. 174, 2F.) Dr. Ranola noted that Jones was unable to work, but does not appear to have been an opining doctor in Jones's hearing. (Tr. 155; *see generally* Pl. B., Tr.1-3.) Physical therapy notes indicated that Jones used her pain medication minimally, and had improved balance and mobility. (Tr. 467.)

In 2006, Dr. Agnes Lun noted that Jones did not have stiffness, synovitis, effusion, or joint enlargement, and that she had normal range of motion in her extremities, and 5/5 strength. (Tr. 204.) Jones had some difficulty following instructions, and declined to ambulate without her cane. (Tr. 206.) Dr. Lun was confused why Jones was using a cane before her diagnosis of rheumatoid arthritis. (Tr. 204.) X-rays revealed degenerative osteoarthritis. (Tr. 208.)

Additionally, Jones presented to Dr. Bramhadevi in October 2006 with complaints of back pain. (Tr. 400.) Dr. Brahmhadevi reported no evidence of abnormality other than tenderness and reflex spasms in the paravertebral muscles. (*Id.*) Blood work revealed

3

elevated rheumatoid factor. (*Id.*) Jones continued to be treated with medication and physical therapy. (*Id.*)

Two years later in February 2008, Jones presented to Dr. Halverson complaining of pain in her hands, back, knees, and legs. (R. 320-327.) She was no longer taking Methotrexate. (Tr. 321.) Jones had joint swelling primarily in her fingers, as well as tenderness in her neck, elbows, upper and lower back, hips and knees. (Tr. 322.) Her rheumatoid factor was positive. (*Id.*) X-rays revealed mild degenerative changes in the first MCP joint bilaterally and sclerotic tips of the terminal phalanges. (*Id.;* Tr. 271.) Jones was given Methotrexate and folic acid again, and started Tramadol. (Tr. 324.) An EEG in March 2008 was normal. (Tr. 271.) Hand improvement was indicated in an April 2008 report but worsening of the right knee was also shown. (Tr. 16.) A May 2008, report disclosed that most of Jones's pain was in her right knee, that she could walk around the block, and that she had chronic back pain. (Tr. 312-313.)

Jones then presented to Dr. Thomas-King in June 2008 with complaints of right shoulder and back pain. (Tr. 388-392.) Dr. Thomas-King noted tenderness of the lumbar spine, but normal range of motion, normal gait, and normal strength. (*Id.*) The right shoulder had palpation and decreased range of motion secondary to pain but normal tone and strength. (*Id.*) Dr. Thomas-King provisionally diagnosed arthritis, degenerative joint disease of the right shoulder, lumbar facet syndrome, lower back pain, and degenerative disc disease of the lumbar spine. (*Id.*) In July 2008, Dr. Thomas-King prescribed a cane. (Tr. 385.) Physical therapy records reflect that Jones's pain gradually reduced, and her function improved with treatment. (*Id.*) The therapist noticed pain associated with straight

4

leg raises, and that Jones had an abnormal antalgic gait and a cane that was too short. (Tr. 383-387.) It appears that the therapist may have recommended the prescribed cane. (Pl. Br. 3; Tr. 383-387.)

In August 2008, Jones fell causing additional pain which was reduced with physical therapy. (Tr.16.) Dr. Thomas-King noticed no other abnormalities except tenderness and reduced lumbar range of motion. (*Id.*) In addition, Dr. Thomas-King observed that Jones's pain was improving after her fall. (Tr. 361-363.)

Jones presented to Dr. Halverson in September 2008 . (Tr. 304.) Dr. Halverson prescribed wrist braces for the associated pain noting that Jones's hands were a little better following treatment with Methotrexate, but her knee had "given out" recently. (*Id.*) In October 2008, Dr. Thomas King evaluated Jones again, finding spinal tenderness, normal sensory in the bilateral feet, and normal right and left knee and ankle reflexes. (Tr. 329-331.)

Jones continued to present to doctors in 2007 and 2008. (Tr. 17.) She complained of problems such as coughing, urinary infections, headaches, and back pain. (*Id.*) Her complaints were addressed with physical therapy that produced good results. (*Id.*)

The ALJ found that none of the mental impairments Jones claimed met the requirements of any of the listings of 20 CFR Part 404, Subpart P, Appendix 1, which would support a determination that a mental impairment was the sole cause of disability. (Tr. 12-13.) Jones does not dispute this finding. (*See generally*, Pl. Br.) Rather, Jones disputes the determination that she is not disabled when her mental impairments are considered in combination with her physical impairments. (*Id.*)

5

It appears that Jones began to see a therapist in early 2006. (Tr. 17.) In March and April 2006, David Schneider, LCSW, reflected that Jones had been diagnosed with depression and post-traumatic stress disorder. (*Id.*) These were addressed with medication and therapy. (*Id.*) Schneider concluded that Jones had a low tolerance for frustration, difficulty engaging in complex tasks that required judgment, difficulty with decision making, and inability to engage in work. (*Id.*) Jones had been seen for ongoing problems including her boyfriend and family. (*Id.*) Notes documented her complaints, but did not provide evidence of significant depressive symptoms. (*Id.*) Schneider saw Jones 45 times from 2006 to 2008. (Pl. Br. 4.)

In August 2006, Jones, accompanied by her SSI advocate, saw state agency consultant Joan R. Nuttall, Ph.D., for a psychological evaluation. (Tr. 198–201.) The SSI advocate indicated she had no concerns about Jones's memory. (Tr. 201.) Jones related her family situation and daily activities such as paying bills, cooking, and grocery shopping. (Tr. 198.) She discussed her depression and stress related to her father's death. (Tr. 199.)

Dr. Nuttall described Jones as pleasant, cooperative, oriented, able to answer questions, capable of following three-step instructions without difficulty, and capable of performing double digit addition and subtraction without difficulty. (Tr. 199.) However, Jones behaved as if she did not hear certain questions, and her test scores were deficient. (Tr. 200.) The data confused Dr. Nuttall in light of Jones's behavior, her descriptions of her daily activities, and her SSI advocate's statements. (*Id.*)

Dr. Nuttall diagnosed dysthymia, but could not confidently diagnose anything else. (*Id.*) Additionally, Dr. Nuttall assessed Jones's Global Assessment of Functioning (GAF) as 61. (*Id.*)

State agency reviewing psychologist Dr. Jack Spear, Ph.D., stated, as of August 2006, that Jones would be moderately limited in her ability to understand and remember detailed instructions, perform detailed instructions, maintain attention and concentration for extended periods, and respond appropriately to changes in the work setting. (Tr. 209-212, 223.)

In May 2007, Jones's treating psychiatrist, Dr. Basil Jackson, indicated Jones was stable on Seroquel, Fluoxetine, and Trazadone. (Tr. 17.) She slept well and her depression was under control. (*Id.*)

In July and August 2007, Schneider indicated that Jones was unable to participate in work activity due to cognitive abilities and mental health issues. (Tr. 18.) Schneider's notes of August 2008 reflected a diagnosis of a major depressive disorder, and a GAF of 45. Schneider identified a variety of symptoms including low energy, appetite and weight change, anxiety, poor sleep, and social isolation. (*Id.*) He opined that these symptoms would interfere with Jones's ability to work, to perform detailed instructions, require unscheduled breaks during the day, and that she would be absent from work four or more days per week. (*Id.*) Additionally, he opined that Jones was unable to interact appropriately with the general public, and would be unable to meet the competitive standards required to understand instructions, maintain attention, work with coworkers, and generally cope with the routine surprises of a workday. (*Id.*) Schneider completed a

Mental Impairment Medical Assessment form in November 2008 reflecting similar limitations. (Tr. 294-97.)

In December 2008, Dr. Jackson and Schneider completed a mental assessment apparently for Jones's disability benefits application. (Tr. 18.) They indicated a diagnosis of depression but explicitly noted that Jones was not bipolar. (*Id.*) In all the areas that Dr. Jackson and Schneider assessed, they described Jones as "fair – seriously limited but not precluded" or "unable to meet competitive standards." (*Id.*) Additionally, they opined that Jones would be absent from work 50% of the time or more due to her impairments. (*Id.*)

Jones testified at her hearing that she could not work due to arthritis, short memory, and fear of crowds. (Tr. 33.) She had two seizures in December relating to her mother's admittance to a nursing home and subsequent passing. (Tr. 34.) Jones's seizures caused her to lose consciousness and to have weak legs. (Tr. 35.) She had roughly 14-15 seizures per year. (Tr. 35.)

She further testified that she had pain in her right leg and hands. (Tr. 34.) She also had arthritis in her hands, right leg, and big toe. (*Id.*) Jones required shots in her back. (Tr. 33.) She treated the pain with a heating pad, medicine, and laying down. (Tr. 36, 38.) Her medications did not cause side-effects. (*Id.*) In addition, Jones could sit for 30 minutes at a time. (*Id.*) On the other hand, she could stand for 15 minutes at a time. (Tr. 17.) Jones could walk around the block though she required breaks to do so, and could lift about five pounds. (*Id.*) She received a cane from Sinai Samaritan Hospital. (Tr. 55.) Jones also received wrist braces, which she wore nearly all the time. (Tr. 37.)

With respect to daily activities, Jones could do the dishes but not for long because she could not stand for long.  (Tr. 38.)  She separated and folded clothes; played cards with her daughter and son; and went to the grocery store once a month, although her daughter carried the bags.  (Tr. 40.)  Sometimes Jones prepared eggs and salami sandwiches for herself.  (Tr. 41.)  She only used a microwave and did not lift pots off the stove or use the oven.  (Tr. 45.)  A friend helped Jones in and out of the bathtub.  (Tr. 47.)  She did not fix her hair unless her daughter helped her; did not vacuum; and did not change her bed.  (Tr. 41.)  On the other hand, she would do a little dusting.  (Tr. 41.)

Jones testified she disliked being around people because "things that I don't mean to say to people that hurt [their] feelings."  (Tr. 36.)  She was still in therapy, attending sessions every other week.  (*Id.*)  Finally, Jones testified that seizures caused her to have leg pain, to foam at the mouth, to lose her urine, and to talk "out of her head."  (Tr. 49-51.)  Jones's pain was severe at a level 9; she had bad days 4-5 times per week; and at times she took Tylenol.  (Tr. 45, 49, 52.)  Physical therapy made her feel better, but it only lasted one to two months.  (Tr. 45.)  For mental limitations, Jones saw Dr. Jackson every month.  (Tr. 50.)  She advised that her depression medication fluoxetine made her feel "funny" and "hyper like." (Tr. 45-6.)

The vocational expert testified that Jones could perform the jobs of an order clerk, call-out operator, surveillance system monitor, cleaner, bagger, or a street cleaner with an emphasis on the order clerk, call-out operator, and surveillance system monitor.  (Tr. 22, 56-62.)

CONCLUSIONS OF LAW

The district court's review is limited to determining whether the Commissioner's decision is supported by "substantial evidence." 42 U.S.C. § 405(g). The Commissioner's findings are conclusive if supported by substantial evidence. *Id*. The court reviews the entire record to determine if the Commissioner's decision is supported by the record. *Arkansas v. Oklahoma*, 503, U.S. 91, 113 (1992). Substantial evidence is such evidence contained within the entire record as a reasonable mind might accept as adequate. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is more than a mere scintilla, but less than a preponderance. *Outlaw v. Astrue,* 412 Fed. Appx. 894, 897 (7th Cir. 2011). The court may not substitute its judgment for that of the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

The ALJ must consider all relevant evidence, and may not discuss only that evidence that supports its own recommendations. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *Zurawski v. Halter,* 245 F.3d 881, 888 (7th Cir. 2001). The ALJ must build a logical bridge between the evidence and the result. *Apfel* at 872.

On appeal, Jones argues that the ALJ failed to assess Jones's residual functional capacity ("RFC") in violation of Social Security Ruling 96-8p and that the ALJ improperly rejected the treating sources in violation of SSR 96-2p. Jones has combined these two SSRs arguing first with respect to her physical assessment, and then with respect to her mental assessment. Specifically, Jones maintains: (1) the ALJ failed to perform an RFC that identified her physical limitations on a function-by-function basis, and to assess how the limitations affected the disability; (2) the ALJ improperly relied on the testimony of state

10

agency consultants over the opinions of the treating physicians; and (3) the ALJ improperly relied on medical evidence that did not sufficiently establish a logical bridge to the ALJ's conclusions.

Social Security Regulation 96-8p requires the ALJ to do an RFC assessment to consider sustained work-related physical and mental activities on a regular and continuing basis. SSR 96-8p. An RFC determines the most work that a person could do regularly. *Outlaw,* 412 Fed. Appx. at 897. Only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments are taken into account in this regard. *Id*. When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity. *Id*.

The ALJ must address the exertional and nonexertional functions required of the particular level of work that the ALJ believes the individual can accomplish. *Id*. Additionally, the RFC must address the remaining exertional and nonexertional capacities of the individual. *Id*. "An ALJ need not discuss every piece of evidence, but must logically connect the evidence to the ALJ's conclusions so that we can provide meaningful review." *Outlaw,* 412 Fed. Appx. at 897. "RFC determinations are inherently intertwined with matters of credibility, and we generally defer to an ALJ's credibility finding unless it is patently wrong." *Id.*

The *Outlaw* decision is particularly instructive. In *Outlaw*, plaintiff alleged that various mental disorders, arthritis, back pain, and carpal tunnel syndrome rendered him

disabled. *Id.* at 895. Plaintiff argued that the ALJ's failure to explain how his limitations in his ability to stand, walk, and use his hands compelled remand of the case. *Id.* at 898. However, the Seventh Circuit reasoned that plaintiff had not presented any medical evidence of his inability to stand or walk. *Id.* at 898. He had presented only limited evidence of the limitations of his hands. *Id.* at 898. Thus, the Seventh Circuit rejected plaintiff's arguments and affirmed the district court's decision to deny remand. *Id.* at 898.

RFC functional assessments must be performed in light of the purpose of the SSR and *Outlaw*. Repeated multiple times throughout the SSR, the RFC must only discuss the full implications of the impact of the injury on plaintiff's ability to perform regular and continuous activity. Additionally, *Outlaw* holds that the plaintiff must provide a medical basis for the alleged impairment of the exertional or nonexertional function. The ALJ need not address functions not impaired.

Social Security Regulation 96-2p governs the support of medical opinions rendered in adjudications. Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. Controlling weight may be given to medical opinion only in appropriate circumstances, *i.e.*, opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources. 20 C.F.R. § 1527(d)(2) contains factors to evaluate. However, "other" is a factor; the issue is not whether all factors were addressed specifically but whether the ALJ provided good reasons to reject the treating doctor's opinion.

12

First, Jones contends that the ALJ failed to perform an RFC that identified her physical limitations on a function-by-function basis, and to assess how the limitations affected the disability. It appears that Jones intends to assert that the ALJ failed to reference the walk/stand, lift/carry, and push/pull factors, specifically focusing on sitting and walking or otherwise failed to perform any RFC assessment. Because of the lack of clarity, the court reviews the ALJ's RFC assessment in its entirety.

After due consideration of the record, the court concludes that the ALJ conducted an RFC assessment as required. The assessment began where the ALJ noted that she "must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit claimant's ability to do basic work activities" (Tr. 14) and then proceeded to do so. (Tr. 14-15). With her sentence ending "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment" the ALJ partly rejected Jones's credibility and concluded her residual functional assessment (Tr. 15.)

Within the RFC, the ALJ reviewed those functional capacities of which Jones had complained. The ALJ considered that Jones had complained of a "level nine pain," that she could only sit for 30 minutes, that she could only stand for 15 minutes, and that she used a cane for the last 15 years. (Tr. 14.) She has 14-15 seizures every year and complained of problems with memory and crying, and of social problems. (*Id.*) The ALJ did not review those functional capacities of which Jones had not complained, as indicated when she wrote that Jones's treating doctor "did not identify any specific limitations for

13

activities such as sitting, standing, walking, lifting, carrying, reaching, or fingering." (Tr. 16-17.)  The ALJ did a functional assessment for those functions impaired, as required by *Outlaw*.  While its not clear which limitation Jones alleges the ALJ did not review, the court cannot find a failure in the ALJ's RFC.

Next, Jones also contends that the ALJ improperly relied on the testimony of state agency consultants over the opinions of Jones's treating physicians because: (a) the ALJ provided only the state agency consultant's opinion; (b) the ALJ failed to cite medical opinion that contradicted the treating physicians; (c) the state agency consultants' opinions in isolation are not sufficient to establish substantial evidence; (d) state agency consultant Dr. Muceno did not have the entire medical record when he reviewed the record, to which 201 pages would be added after his review; (e) the state agency consultant did not sign the RFC assessment, thereby rendering it insufficient to establish substantial evidence; (f) the treating physicians' opinions were consistent with laboratory and clinical diagnostic techniques, requiring them to be afforded controlling weight; (g) even if the treating physicians' opinions are not controlling, then they should be provided with "greatest weight and should be adopted" (Pl. Br. 10); and (h) the ALJ failed to consider the treating physician's opinions.  The court combines these arguments into one review of what the ALJ did rather than reject each part to this argument.

The ALJ reviewed multiple sources in Jones's case to create a pool of specific facts, including those from Jones herself, her medical records, her treating doctors, a social worker, a physical therapist, and the state agency consultants.  (*See generally*, Tr. 14-21.) Reviewing the entirety, this body of material does not disclose exclusive reliance on state

agency consultants.  Moreover, the ALJ rejected certain portions of medical opinions as invasions of the province of the Commissioner, and accepted those portions of the opinions that presented her with specific facts.  (*Id.*)

The ALJ reviewed all of the medical evidence provided by the treating doctors.  The ALJ noted that Dr. Rassouli's progress notes indicated that Jones's seizures were under control.  (Tr. 15.)  She observed that Jones had stated to Dr. Rassouli that her headaches were under control by September 2008.  (*Id.*)  Also, the ALJ commented that Dr. Ranola's treatment notes reflected that Jones only minimally used pain medication and had significantly improved balance and mobility.  (*Id.*)  Further, Dr. Lun indicated no stiffness, normal range of motion, good strength, no effusion or joint enlargement, and back flexion of 85 percent.  (Tr. 15.)  Additionally, the ALJ noted that Dr. Bramhadevi found no abnormality other than tenderness and reflex spasms in Jones's back.  (Tr. 16.)  Moreover, the ALJ determined that Dr. Halverson had observed mild degenerative changes, mild knee tenderness, and unremarkable x-rays.  (*Id.*)  She noted that Dr. Thomas-King concluded that Jones had normal motion, normal gait, and normal strength.  (*Id.*)  Dr. Thomas-King also performed a neurological exam that revealed no evidence of abnormality.  (*Id.*)

Next, the ALJ did not accept certain conclusory portions of the opinions.  The ALJ was explicit in her rejection of aspects of treating doctors' opinions, noting "that statements that a claimant is 'disabled' or 'unable to work' are not medical opinions, but rather, are issues reserved to the Commissioner.  Opinions of issues reserved to the Commissioner, *such as* that of Dr. Rassouli and Dr. Ranola, can never be entitled to controlling weight, but

15

must be carefully considered to determine the extent to which they are supported by the record as a whole or contradicted by persuasive evidence." (Tr. 19)(emphasis added). As the ALJ clearly indicated, she reasonably relied on the opinions of those treating doctors to the extent that they presented specific facts, but stopped short of accepting their legal conclusions.

For example, the ALJ rejected Dr. Rassouli's opinion that Jones's seizure disorder was a disability based upon medical evidence and Dr. Rassouli's medical notes. (Tr. 18.) The medical evidence reflects that the seizure disorder was "essentially well-controlled with medication management" (*id.*), EEGs indicated normal results (Tr. 15), and Jones had reported her headaches were under control (*id.*). Similarly, the ALJ rejected portions of Dr. Thomas-King's opinion that were contradicted by Dr. Thomas-King's refusal to indicate limitations in Jones's functional abilities. For example, though Dr. Thomas-King concluded that Jones would miss four days each month due to her disability, Dr. Thomas King refused to indicate on a medical form how Jones's abilities to sit, stand, lift, etc., were impaired. (Tr. 16-17.) Barring medical opinion intruding on the province of the ALJ is not patently wrong. Indeed, this decision was supported by substantial evidence.

The ALJ did rely on state agency consultants including Dr. Muceno to determine that Jones was restricted to light work. (Tr. 20.) However, in consideration of the above discussion, the ALJ had other evidence from a variety of sources. Moreover, the ALJ applied great weight to Dr. Muceno, not controlling weight. Great weight indicates reliance in part rather than the exclusive reliance of controlling weight. It follows that the ALJ only relied in part on the state agency consultant's opinion. Additionally, Jones has not

16

contended that her condition significantly worsened after Dr. Muceno's November 2006 review of her records. (Pl. Br. 9-10.) There was substantial evidence to rely in part on the state agency consultants' opinion.

Together, this analysis shows that the ALJ rested her decision in part on the facts presented by Jones's medical history, by her treating doctors, by her physical therapist, by a social worker, and by state agency consultants. The ALJ did not rely on any one source to the exclusion of the others. She had good reason to exclude those portions of opinions that invaded the province of the Commissioner. Relying on a variety of sources established substantial evidence sufficient to create a logical bridge for the ALJ to deny Jones's disability claim.

Jones also contends that the ALJ improperly relied on medical evidence that did not sufficiently establish a logical bridge to the ALJ's conclusions. Specifically, she contends: (a) the ALJ improperly rejected opinions related to the severity of Jones's rheumatoid arthritis and fibromyalgia; and (b) the ALJ improperly rejected Dr. Thomas-King's opinions regarding Jones's limitations.

The factual basis for Jones's contention that the ALJ improperly rejected Dr. Halverson diagnosis of fibromyalgia is unclear. Indeed, the ALJ accommodated the diagnosis. Jones submits that:

> the ALJ stated [that] Plaintiff failed to have ongoing treatment for fibromyalgia and x-rays for rheumatoid athritis were unremarkable for knee pain. Tr. 16. However, when Dr. Halverson examined Plaintiff on 2/27/08 he noted Plaintiff had 11/18 tender points for a diagnosis of fibromyalgia. He prescribed Tramadol for fibromyalgia and Methotrexate for rheumatoid arthritis, both of which Plaintiff continued to take at the time of the hearing Plaintiff. [*sic*] Tr. 267, 321-323. Plaintiff reported to Dr. Halverson improvement in her hand pain. However, as the ALJ acknowledged, in

17

September 2008 Dr. Halverson prescribed and Plaintiff was fitted with bilateral wrist splints, because of Plaintiff's ongoing hand pain and cramping. Tr. 16. ... Thus, Plaintiff contends the ALJ's disregard of Dr. Halverson's finding are not supported by substantial evidence in the record.

(Pl. B., Tr.11.) Unlike Jones's representations, the ALJ never rejected Dr. Halverson's opinion for fibromyalgia, as indicated when the ALJ accommodated the diagnosis by limiting Jones "to a range of less demanding light work." (Tr. 19.) Further, the ALJ noted the fibromyalgia diagnosis (*id.*), the Tramadol (Tr. 16), and the bilateral wrist splints (*Id.*). The ALJ also referenced Jones's "minimal reference to the diagnosis, and minimal treatment for it." (Tr. 19.) Indeed, the court does not find any other reference to fibromyalgia other than what has already been explained. Consequently, the court finds that the ALJ reviewed all of the evidence available with respect to the severity of the fibromyalgia diagnosis, and the ALJ accommodated the diagnosis as appropriately reflected by the limitations established by Jones.

Next, Jones argues that the ALJ improperly rejected Dr. Halverson's and Dr. Thomas-King's opinions regarding the severity of the arthritis. With respect to the rejection of Dr. Thomas-King's opinion, Jones contends the ALJ erred by (1) failing to state which treatment records contradicted Dr. Thomas-King's opinions, and (2) improperly rejecting Jones's statements that she needed a cane. Jones asserts that, even though canes do not require prescriptions, the physical therapist prescribed a cane for Jones. Additionally, she contends that the ALJ implicitly required objective medical evidence even though that is not a sufficient reason to discredit testimony of pain. Jones also argues that Dr. Thomas-King's testimony was consistent with the opinions of Dr. Halverson, Dr. George King, and the physical therapist.

18

Most of Jones's contentions about arthritis and pain are generally dispelled in the court's analysis above. The ALJ did not reject the opinions of Jones's treating doctors in their entirety. Rather, the ALJ rejected those portions of the opinions that infringed on the province of the Commissioner. The ALJ did not need to have contradictory medical records to do this, and even relied on the records provided by the very doctors whose conclusions she rejected. Indeed, the ALJ provided substantial evidence that Jones's injuries were mild, and her pain controlled by medication by reviewing x-rays, EEGs, physical exams, and multiple progress reports from multiple doctors. The ALJ's findings were supported by substantial evidence, and were not patently wrong.

Also, the ALJ did not implicitly require Jones to present objective medical evidence with respect to pain in Jones's shoulder, knee, or hand pain. Jones cites to a page of the ALJ's opinion where the ALJ declined to extend controlling or great weight to Dr. Rassouli, Dr. Thomas-King, the diagnosis of fibromyalgia, and Schneider. (Tr. 19.) It is unclear which particular person or diagnosis Jones relies on to make her contention, but she likely refers to the rejection of Dr. Thomas-King's opinion relating to shoulder, knee, or hand pain. In any case, the ALJ did not indicate that she required objective medical evidence, but that the objective medical evidence available to her conflicted with Dr. Thomas-King's opinion. (*Id.*) The objective medical evidence available to the ALJ included, in part, x-ray and exam evidence that showed mild problems (*Id.*) The ALJ noted that wrist splints, medication, and therapy had all produced good results. (*Id.*) Additionally, the ALJ observed that, during the 45 minute hearing Jones did not appear to be uncomfortable as she sat and walked around the room. (*Id.*) The decision to rely on the available medical

evidence was not patently wrong. Rather, the decision was a diligent effort to appropriately weigh all of the evidence available.

As a final matter with respect to Jones's physical limitations, Jones creates an issue regarding the ALJ's discussion of her cane. However, it is unclear where Jones finds a basis to charge that the ALJ committed reversible error in this discussion. The case law Jones cites showing that canes do not require prescriptions might be entirely correct, and she might likewise be correct that the physical therapist provided her a more effective cane. (Tr. 12.) However, this bears no reflection on the ALJ's questioning of Dr. Thomas-King's credibility with respect to her conclusion that Jones was disabled. The ALJ's point was twofold. First, the ALJ observed that, despite Jones's reliance on the cane as evidence of pain, Jones did not use the cane when she walked. (Tr. 19.) Indeed, though Jones carried it with her during the hearing, it did not touch the floor. (*Id.*) Second, the ALJ found that Jones presented evidence that she used the cane for the last 6-7 years. (*Id.*) In light of these observations, the ALJ reasonably questioned how effectively Jones used the cane during those 6-7 years. (*Id.*) This implicitly questioned Jones's statements regarding the intensity of her pain, which were adopted by Dr. Thomas-King when she found Jones to be disabled. While this evidence is not decisive on its own, certainly the ALJ was permitted to review it as a small part of her evaluation of whether to give controlling weight to Dr. Thomas-King's opinions.

Next, Jones argues that the ALJ erred when she analyzed Jones's mental impairments. Specifically, Jones contends that: (1) the ALJ relied only on state agency consultants; (2) the ALJ improperly rejected the opinion of social worker Schneider; and

(3) the ALJ improperly rejected the opinion of Dr. Jackson. The crux of Jones's argument seems to be that Schneider's notes conclusively establish that her "ongoing issues with her boyfriend, his drinking and abuse of her, being tired, having decreased sleep and memory, worrying, having racing thoughts, having increased depressive symptoms" were indicative of mental limitations not addressed appropriately.

Here, the ALJ reviewed Schneider's records, finding that he had: (1) diagnosed a major recurrent depressive disorder and a GAF of 45; (2) recorded multiple patient-reported symptoms generally including chronic fatigue, anxiety, depression, and sleep disturbance; and (3) made findings concerning Jones's ability to complete tasks and relate to people. (Tr. 18.) The ALJ also reviewed a mental assessment signed by Dr. Jackson and Schneider reflecting a diagnosis of severe depression, low normal IQ, and the need for Jones to miss work 50% of the time. (Tr. 18.) The ALJ observed that Schneider is a social worker whose view was not entitled to controlling weight, but considered his opinion nonetheless. (Tr. 20.) The ALJ stated that treatment records of Dr. Jackson and Schneider as well as Jones's statements on the record indicate that her depression is well-controlled by medication. (*Id*.) Jones had displayed an ability to handle her finances, care for herself, care for her 11 year old daughter, and perform regular household chores. (*Id*.) The ALJ also relied on the observations of the state agency examiner who administered Jones's IQ test and noted that her behavior, her description of her activities, and the observations by her advocate were inconsistent with the results of the test. (*Id*.) The consultive examiner's test provided a GAF of 61. (*Id*.) Though the ALJ rejected the statements of Dr. Jackson and Schneider that infringed on the province of the

21

Commissioner, she reviewed their opinions for facts.  As a consequence, the ALJ rejected those portions of  Schneider's notes that simply contained a list of symptoms reported by Jones and no other support.  With the remaining facts compiled, the ALJ had substantial evidence that Jones's mental conditions are generally well-controlled by medication. Reliance was placed on the state agency consultant, but not exclusively.   Hence, it is unclear where the ALJ's decision may have been patently wrong or not supported by substantial evidence with respect to the discussion of Jones's mental limitations.

Jones appears to argue that the ALJ improperly rejected her credibility in violation of SSR 96-7p: (1) by failing to consider why she had not worked prior to her disability application; (2) by continuing to refer to her use of a cane without prescriptions; (3) by relying on state agency consultants statements regarding her "good functioning abilities;" and (4) by relying on her daily activities to improperly contradict contentions of disabling pain.

Social Security Regulation 96-7p governs findings on the claimant's credibility.  The ALJ must provide specific reasons for a finding on credibility.  The ALJ must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight that the adjudicator gave to the individual's statements, and reasons for that weight. SSR 96-7p.

The reasoning in support of Jones's argument concerning the ALJ's failure to consider why she had not worked prior to her disability application is unclear.  Similarly, the materiality of this argument is also unclear.  Jones states simply that "According to the Seventh Circuit, the ALJ failed to understand the lives of may [*sic*] of the people who apply for social security benefits and failed to consider why Plaintiff had not worked, i.e., [*sic*]

22

fibromyalgia, rheumatoid arthritis, depression, borderline intellectual abilities. [*sic*] Sarchet v. Chater" (Pl. Br. 14.)  *Sarchet v. Chater*, 78 F.3d 305 (7th Cir. 1996), to which Jones cites, is a significantly different case.  In *Sarchet*, the list of impairments are quite extensive:

> Ignored is the long list of medical ailments from which Sarchet suffers and, so far as appears, has long suffered, over and above fibromyalgia. She has thickening of the vocal cords that makes her inaudible after speaking for an hour and a half or two hours. She has moderately severe emphysema. She is depressed, and takes antidepressants. She is emotionally unstable. She is obese. She has chronic heartburn, puffy legs, high blood pressure, arthritis, anxiety, allergies, pneumonitis, tachycardia, spondylosis. One of her kidneys and a part of her intestines have been removed. At the time of the hearing she was taking a remarkable number of pills, including Carafate, Verapamil-ER, Relafen, Acetaminophen, Benadryl, Tussi-Organidin elixir, Desyrel, Axid, and Lozol-and some of these medications had produced side effects that added to her medical woes. Despite all this, if she were a highly educated person she could do brain work between popping pills.

*Id.* at 308.  Additionally, the ALJ in *Sarchet* relied heavily on Sarchet's failure to find work, writing "that Sarchet's credibility is additionally undermined by her extremely poor work history. She has had less than $1,000 in earnings on which Social Security taxes have been paid in her entire life. Clearly she has had little connection to or interest in employment." *Id.* (internal citations omitted).

It is not clear how Jones expects the ALJ to take her prior life into account.  In her case, Jones has asserted *controlled* emotional issues, a medical history lacking surgery, and medically *undeterminable* conditions. Unlike the ALJ in *Sarchet*, the ALJ in this case considered fibromyalgia, arthritis, depression, and borderline intellectual functioning, specifically naming them in her decision.  (Tr. 12.)  The ALJ did not rely heavily on Jones's

23

failure to work before she applied for disability benefits, but only made passing mention of it after reviewing all of the medical evidence in the record.  (Tr. 21.)

Next, Jones argues that the ALJ's "continued rehash[ing]" of her use of a cane without a prescription is not a sufficient basis for finding her without credibility.  As an initial matter, the ALJ did not make such a significant issue of it.  The ALJ made passing reference to it in review of the evidence, in her discussion of the weight of Dr. Thomas-King's opinions, and in her rejection of Jones's credibility.  This was one issue – observable by the ALJ in the hearing – among many.  It was not as significant an issue in the ALJ's opinion as suggested by Jones's brief and this opinion reviewing Jones's brief. Second, Jones continues to mistake the ALJ's purpose in referring to the issue.  The issue was not about Jones's prescription or lack thereof, it was about (1) the *credibility* of her claimed onset date, and (2) the *credibility* of her claimed pain severity.  Jones represented a date of onset in 2001, but then revealed that she had been using the same treatments for the same symptoms prior to that date.  It is unclear why Jones picked February 1, 2001, as the onset date if she had similar symptoms before that date.  The discrepancy questions the credibility of Jones's statements that her pain after her onset date contributed to her disability.  Additionally, Jones claimed that she used a cane to relieve pain, but then carried the cane during the hearing without letting it touch the floor.  This fact independently questions the credibility of Jones's implicit assertion that her pain was so severe that she required a cane.  Together, the two facts question Jones's statements regarding the severity of her pain between her onset date and the date of the hearing.  While alone these

two instances are not enough to establish substantial evidence, they were not improperly relied upon by the ALJ as Jones contends.

Jones appears to contend that the ALJ relied too heavily on the state agency consultants to reject Jones's credibility. It is unclear whether Jones refers to Dr. Lun or Dr. Nuttall, both of whom expressed confusion regarding Jones's symptoms. Dr. Lun expressed confusion regarding why Jones used a cane without a prescription, while Dr. Nuttall expressed confusion regarding an apparent discrepancy between: (1) Jones's psychological exam results; and (2) her behavior and statements from her SSI advocate. Regardless, the court has rejected Jones's assertion that the ALJ relied too heavily on the various state agency consultants. The ALJ properly reviewed the variety of information on the record, including Jones's treating doctors, her social worker therapist, her physical therapist, her medical records, and the state agency consultants, and relied on substantial evidence to create a logical bridge to her conclusions. She was not patently wrong in her actions.

Next, in support of her argument that Jones's daily activities did not contradict her statements regarding the intensity of pain, Jones maintains that the ALJ's finding is deficient for the following reasons: (1) the ALJ failed to appreciate that her daily activities do not contradict her claim of disabling pain; (2) the ALJ failed to mention that she testified that she had a level 9 pain; (3) the ALJ failed to mention that she had bad days 3-4 days each week; (4) the ALJ failed to mention that Schneider noted that her mental symptoms were aggravated by stressors including her boyfriend and family; (5) the ALJ failed to mention that she used a hot pad for pain; (6) the ALJ failed to mention that she took

Tylenol 3 for pain; and (7) the ALJ failed to mention that she laid down at least once a day due to pain. (Pl. Br.15.) The court understands Jones's implicit argument to be twofold, including (1) the ALJ failed to provide specific reasons to reject her credibility, and (2) the ALJ failed to mention contrary evidence.

First, the ALJ mentioned several instances where Jones compromised her credibility. Despite Jones's statements concerning the intensity and persistence of her pain, objective medical evidence had not established more than "mild" or "tender" pain points and doctors had noted no strength problems when administering strength tests. (The strength tests allow the reasonable inference that the pain was sufficiently minor so as not to compromise Jones's strength.) Additionally, in the hearing, Jones represented that she had not drank alcohol since 2001. However, in September 2007, she called 911 after drinking alcohol. (Tr. 21.) Though Jones represented that she could not sit for more than 30 minutes (Tr. 14), she sat for 45 minutes without apparent trouble in the hearing (Tr. 19). The discrepancies between GAF results of 45, 61, and behavior suggest that Jones's mental limitations were not as severe as represented. These examples establish substantial evidence and a logical bridge to finding Jones not credible.

Second, the court does not find merit in Jones's argument that the ALJ failed to mention specific evidence, noting that the ALJ's opinion explicitly addresses many of Jones's examples and indirectly incorporates the remainder. For example, the ALJ discussed in her opinion that Jones "rated her typical back pain as a nine on a scale from one to ten...[To relieve pain,] she uses pain medications and a heating pad, and lays down every day." (Tr. 14.) Additionally, the ALJ observed that Schneider's "progress notes show

26

that the claimant was seen for supportive therapy, primarily related to ongoing problems with the relationships with her boyfriend and family members." (Tr. 17.) While these may not be exact recitals of the evidence that Jones alleges the ALJ did not review, the statements are certainly quite similar. Indeed, "ongoing problems" is closely associated to "aggravated stressors," and laying down every day because of pain certainly suggests pain at least 3-4 days every week. Similarly, Tylenol 3 is a medication. In any case, the ALJ constructed a logical bridge from the available evidence to the ALJ's conclusions, though the ALJ need not discuss each and every piece of evidence. No category of evidence or major piece of evidence is missing from the ALJ's decision.

Jones's arguments are unavailing in their attempt to convince this court to remand her case to the ALJ. Rather, the ALJ made a decision well supported by substantial evidence that a person with Jones's pain, seizure, and mental limitations is not disabled under the Social Security Act. Now, therefore,

IT IS ORDERED that the Commissioner's decision to deny Supplemental Security Income benefits to Diane Jones is affirmed.

IT IS FURTHER ORDERED that this case is dismissed.

Dated at Milwaukee, Wisconsin, this 31st day of October, 2011.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE